Argued at Pendleton May 6; affirmed June 18; rehearing denied
July 30, 1935

## ZOGRAPHOS *v.* VICHAS ET AL.

(46 P. (2d) 577)

*J. R. Raley, J. H. Raley, Jr.,* and *J. F. Kilkenny,* all of Pendleton (Raley, Kilkenny & Raley, of Pendleton, and John P. Winter, of Portland, on the brief), for appellant.

*C. Z. Randall,* of Pendleton (Fee & Randall, of Pendleton, on the brief), for respondent.

KELLY, J. The appealing defendant urges that plaintiff should not have been granted any relief because, as said defendant contends, plaintiff is in equity with unclean hands. In other words, appealing defendant invokes the maxim, ''He who comes into equity must do so with clean hands''.

The mortgaged property is a hotel and its equipment. Except the corporate defendant, the General Petroleum Corporation of California, the parties hereto, plaintiff and defendants, are Greeks. One of the issues is whether plaintiff ousted the tenant of appealing defendant and, acting with one Gunis and

George Zographos, took possession of and profitably operated the hotel, as defendant claims, or merely acted as a gratuitous agent in attempting to secure a new tenant after the original tenant left, as plaintiff claims. The trial court found in accordance with defendant's contention on this issue.

In his opening brief, appealing defendant argues that plaintiff's hands are unclean in the following respects:

(1) In ousting Jim Kalegas, the appellant's lessee, from the premises while leading appellant to believe that Kalegas had abandoned the premises.

(2) In conspiring with George Zographos and Peter Gunis to cheat and defraud appellant out of the rents and profits forthcoming from the operation of the hotel properties.

(3) In failing to account to the appellant for the rents and profits received from the hotel properties during the operation thereof by the respondent Peter Gunis and George Zographos.

(4) In violating the trust placed in the respondent by the appellant when the appellant placed the respondent in possession of the hotel properties as a mortgagee in possession and as agent of appellant.

█ The finding of the trial court is supported by the record to the effect that plaintiff operated the hotel; but, in itself alone, such finding is not sufficient to support the contention that plaintiff is in equity with unclean hands.

It is true that, in his reply brief, appealing defendant states that plaintiff required the aid of perjured testimony in his attempt to make out a case on the following items claimed to have been advanced by plaintiff as part of the consideration for the mortgages in suit: $700 to appealing defendant, $3,500 to Peter

Gunis, and $180 to the World War Veterans' State Aid Commission.

The trial court did not so construe the record, nor do we feel justified in doing so.

Appealing defendant cites with approving comment the opinion in the cases of *Keystone Driller Co. v. General Excavator Co. (Keystone Driller Co. v. Osgood Company)*, 290 U. S. 240 (78 L. Ed. 293, 54 S. Ct. 146). For that reason, we venture to quote therefrom as follows:

"But courts of equity do not make the quality of suitors the test. They apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter of litigation. They do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violation of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication. Story Id. § 100, Pomeroy Id. § 399. They apply the maxim, not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice. They are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."

■ The mortgages, for the foreclosure of which this suit was instituted, are not the result of, or based upon, any of the conduct referred to in the court's finding, as to the operation of the hotel by plaintiff or set forth in his opening brief by appealing defendant as constituting unclean hands. This alleged conduct was subsequent to the execution of said mortgages. If plaintiff could not support his prayer for relief without disclosing iniquitous conduct on his part constituting an integral part of the factual ground upon which he based

his claim for relief, it might well be held that he was not in court with clean hands; but, such is not the state of the record in the case at bar.

Four points are urged in support of the second assignment of error, which is that the trial court erred in decreeing that plaintiff had established, by a preponderance of the evidence, that the note and mortgages were made, executed and delivered for a consideration paid, or to be paid, in the sum of $13,600.

The first of these points is that, where the consideration of the mortgage is not definitely ascertained at the time of its execution, or, consists of contingencies, liabilities or advances thereafter to be made, the burden is upon the holder to show the amount actually advanced.

The only Oregon case cited to this point is one wherein the mortgagee was the attorney for the mortgagor, the mortgage was executed in the sum of $2,000. The amount to be advanced was not determined. This court treated the case as a suit for an accounting and for the foreclosure of the mortgage to secure the amount so found to be due: *Graber v. Boswell,* 94 Or. 70 (181 P. 986, 185 P. 231).

While an accounting in the case at bar was undertaken, it arose because of the claim of defendant that subsequent to the execution of the mortgages, plaintiff operated the mortgaged premises as a hotel at a profit. The accounting was not necessary by reason of the mortgages in suit.

*Maddock v. Connolly,* 82 N. J. Eq. 609 (90 Atl. 314), cited by defendant, is a case where a mortgage for $30,000 was given to a father by his son for advances to be made. There was no proof of any advances having been made. The court approved the dismissal by the vice chancellor before whom the cause was heard.

In *Turman v. Forrester,* 55 Ark. 336 (18 S. W. 167), an instrument in the form of an absolute deed was sought to be foreclosed. Why the note in that suit was given is not explained. The grantee agreed to pay the grantor's debts, and to save the grantor's property from sale. In consideration of this promise, and in order to secure to the grantee the payment of such sums as he should thus pay, and to indemnify him against a liability as a surety upon an appeal bond, the deed was executed, and for the same purpose and about the same time grantor executed to the grantee a bill of sale of his personalty. The amount, which the grantee was to pay, was uncertain. The grantor's liability on one debt for a large sum was then being contested and until it was determined, the amount of the grantor's debts could not be known.

*Brant v. Hutchinson,* 40 Ill. App. 576, is a case wherein deeds of trust and notes accompanying them were given as security for what might become due under a contract. The court held that in legal effect they were mortgages to secure future advances upon the contract, and were not given as any evidence of present indebtedness.

■ The distinction between the three cases last above mentioned and the case at bar is obvious. The amount of the liability assumed herein was agreed upon. The amount to be advanced to defendant was fixed. In stating this fact, we are aware that defendant disputes it; but, such is the character of plaintiff's claim and we think no error was committed by the trial court in upholding it.

■ Moreover, this court is now committed to the view that the maker of a note has the burden of proving absence or failure of consideration and such burden remains on the maker throughout the trial: *Kemp-*

*painen v. Suomi Temperance Society,* 128 Or. 643 (275 P. 680).

The case of *Lavender v. Buhrman-Pharr Hardware Co.* (177 Ark. 656, 7 S. W. (2d) 755), is controlled by section 4114 C. & M. Dig. Statutes of Arkansas. This section of the statute provides:

"Where a writing purporting to have been executed by one of the parties is referred to in and filed with a pleading, it may be read as genuine against such party, unless he denies its genuineness by affidavit before the trial is begun."

The Arkansas court has construed this section to require proof by the holder of a note of its execution when the party sought to be charged denies its genuineness by affidavit before the trial is begun: *St. Louis I. M. & S. Ry. Co. v. Smith,* 82 Ark. 105, 109 (100 S. W. 884); *J. R. Watkins Med. Co. v. Warren,* 150 Ark. 542 (234 S. W. 618); *Ohio Gal. Co. v. Nichol,* 170 Ark. 16 (279 S. W. 377).

In the *Lavender v. Buhrman-Pharr Hardware Company* case appellants made denial in accordance with said section of the statute of their endorsement of the draft in suit. This prevented the reading in evidence of the draft as a receipt of the money or in anywise binding against them for its payment. There is no such statutory provision in Oregon.

As we understand the record, the consideration of the mortgages in suit was definitely ascertained at the time of their execution; there were no contingencies or indefinite liabilities involved. There was an advance of $700 to be made by the plaintiff mortgagee to the defendant mortgagor.

■ The challenge, therefore, by defendant in his defense of lack or failure of consideration imposed upon

him the burden of establishing that defense by a preponderance of the evidence.

■ The second point is based upon the statement that, where a witness is deliberately false in one part of his testimony, a court can not rely on anything to which he testifies. The statute is to the effect that such witness is to be distrusted. Unfortunately, there is so much apparent inconsistency in the evidence on the part, not only of plaintiff and several of his witnesses but also of appealing defendant and some of his witnesses, that the statutory distrust attends us on both sides of this controversy. Again, it must be remembered that we are dealing with foreigners, whose methods of business and manner of expression are widely different from ours.

The third point is that presumptions are indulged in only to supply facts, and do not arise where the facts are known. Very frequently the facts are not known to the court. Many times, as in this case, the record is in a state of confusion by reason of the peculiarities of the witnesses, their inconsistent statements and their unusual, even extraordinary, manner of transacting business.

The fourth point is more refreshing. It is that in passing on a question of fact, where there is direct conflict, the court, in its analysis of the evidence, must be governed by the rule of probabilities.

■ The decisive feature of this phase of the case is the testimony of Judge Fee, who testified for plaintiff at the conclusion of defendant's case in chief. It is urged by appealing defendant that Judge Fee's testimony must be restricted in its effect merely to the matter of impeachment. We are unable to accept this view. An affirmative defense was interposed, namely, want of consideration. On this issue, except as to the

item of $700, which was to have been advanced to the mortgagor, the defendant held the affirmative. To meet defendant's showing thereon, plaintiff was entitled to introduce evidence after such showing had been made: *Kemppainen v. Suomi Temperance Society,* 128 Or. 643 (275 P. 680).

No good purpose can be served by reviewing the testimony here. Suffice it to say, that a consideration of the entire record, giving Judge Fee's testimony substantive, as distinguished from impeaching, value, leads us to the same conclusion as that to which the trial court came.

Assignments numbered three and four present the question of the amount which should be charged against plaintiff for the use of the mortgaged property while he and his associates were operating the hotel business.

The record discloses that the premises were leased to one Kalegas, who, through Mr. and Mrs. Mike Callos, operated the same. This lease was for a term of five years, beginning July 1, 1927, and ending June 30, 1932. It provided for the payment of a $200 monthly rental, for the payments to become due on an ice machine at $37.50, and which aggregated $330, and that the lessee should keep up the furniture, supplies, linen and dishes in said premises at all times supplying new material when old ones are wornout, lost or broken, and, at the termination of the lease, the lessee should turn back to the lessor in as good condition as when the lease was executed, reasonable wear and tear excepted, so far as the furniture is concerned, the same amount of furniture, supplies and materials received by him at the beginning of the lease.

It is urged that plaintiff and his associates misrepresented to appealing defendant that Kalegas had

abandoned the premises and in reliance upon such misrepresentation defendant authorized plaintiff by letter and by power of attorney to secure another tenant. We are unable to concur in this view. In this record Mr. Kalegas' given name appears as "Jim". Defendant's letter, dated January 10, 1928, known to this record as PX6½, contains this sentence: "In regard to Mike if he left, see if you can find somebody else." It is evident that defendant was referring to Mike Callos, and not to Jim Kalegas. The record discloses that Callos left the premises. It is true that Mrs. Callos remained in the hotel for a short time after Callos left. On the 6th of January, 1928, appealing defendant executed a power of attorney, among other things, authorizing plaintiff to execute leases for him. Appealing defendant thus waived the provisions of the Kalegas lease as far as plaintiff was concerned, and thereafter those provisions were not controlling in regard to the amount chargeable against plaintiff for the use of the premises.

The trial court found that plaintiff ousted Kalegas, and, hence, the court charged plaintiff with rental at the rate fixed in the Kalegas lease for the first four months of 1928. We are unable to construe the evidence in this way. As stated, Callos left, and while Kalegas and Mrs. Callos' mother testified that Mrs. Callos was unwilling to leave, witness Karatsas, who appears to be a disinterested witness, testified that Mrs. Callos had taken a room at his place two or three days before she left the premises in suit.

The charges made by the trial court against plaintiff are as favorable to appealing defendant as the record warrants. The record is unsatisfactory, due in a large part to the fact that the parties and most of

the witnesses are foreigners. The learned trial judge had the advantage of observing the witnesses and noting the manner in which they testified. We find no ground upon which we would be justified in modifying the decree of the circuit court. Such decree, therefore, if affirmed.

CAMPBELL, C. J., not sitting.